## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **LIBERTY CORPORATE CAPITAL LIMITED,** | ) ) ) | |
| **Plaintiff/Counterclaim Defendant,** | ) ) ) | |
| **v.** | ) ) | **Case No.:  1:16-CV-0791-VEH** |
| **CLUB EXCLUSIVE, INC.,** | ) ) | |
| **Defendant/Counterclaim Plaintiff.** | ) ) | |

## MEMORANDUM OPINION

### I.      Procedural Background

Plaintiff/Counterclaim Defendant Liberty Corporate Capital Limited ("Liberty")

initiated this insurance action on May 13, 2016. (Doc. 1). Liberty sued

Defendant/Counterclaim Plaintiff Club Exclusive, Inc. ("Club Exclusive") for a

declaratory judgment of its rights and obligations under a commercial insurance policy

(the "Policy") issued to Club Exclusive. *Id.* Club Exclusive answered Liberty's

complaint and counterclaimed against Liberty on June 22, 2016. (Doc. 12).[1]

---

[1]  In this same pleading, Club Exclusive filed claims against Wesley Charles Duesenberg, Jr. ("Mr. Duesenberg") and Marian Washburn ("Ms. Washburn") for the negligent procurement of insurance and breach of contract to procure insurance. However, on October 24, 2016, the Court granted (Doc. 37) those parties' respective Motions To Dismiss (Docs. 29, 33), and Club Exclusive's claims against them no longer remain pending. Additionally, Mr. Duesenberg and Ms. Washburn were terminated as active parties on that same date.

On October 17, 2016, Liberty filed a Motion for Summary Judgment (doc. 36) (the "Rule 56 Motion") as to all remaining claims and counterclaims. Club Exclusive failed to respond to the Rule 56 Motion. On June 26, 2017, the Court granted the Rule 56 Motion, entered a declaratory judgment in favor of Liberty, and dismissed the entire action with prejudice. (Docs. 38, 39).

Subsequently, Club Exclusive moved to set aside that Rule 56 judgment in accordance with the excusable neglect standard under FED. R. CIV. P. 60(b). (Doc. 40). On November 21, 2017, the Court granted Club Exclusive's request for post-judgment relief. (Doc. 43). As a result, the Court's prior summary judgment opinion (doc. 38) and final judgment order (doc. 39) were vacated.

Club Exclusive filed its opposition to the Rule 56 Motion (doc. 44) on December 12, 2017. Liberty followed with a Partial Motion To Strike Antineeka White's Affidavit (doc. 45) (the "Partial Strike Motion") on January 4, 2018, and a reply in support of its Rule 56 Motion (doc. 46) on January 5, 2018.[2]

---

[2] Liberty attached two affidavits and two other documents to its reply brief without seeking consent from Club Exclusive or permission from the Court. Appendix II of the Uniform Initial Order makes it clear that a moving party must file its evidentiary materials by the deadline for dispositive motions. (*See* Doc. 2 at 14 ("Any motion for summary judgment and supporting brief <u>and evidentiary materials will be due on or before that [dispositive motion] deadline</u>.") (emphasis added)). At the same time, Club Exclusive neither sought to strike these attachments as untimely nor requested an opportunity to file a surreply. In the absence of any affirmative steps taken by Club Exclusive to counter Liberty's untimely-filed additional evidence, the Court has excused Liberty's noncompliance with Appendix II as waived and/or unopposed by Club Exclusive.

Club Exclusive opposed the Partial Strike Motion on January 31, 2018. (Doc. 47). Finally, on February 5, 2018, Liberty filed its reply. (Doc. 48). Thus, the Rule 56 and Partial Strike Motions are now ripe for disposition.[3] For those reasons explained below, Liberty's Rule 56 Motion is due to be granted in part and otherwise denied. Liberty's Partial Strike Motion is due to be granted.

## II. Factual Background[4]

### A. Club Exclusive's Formation

Club Exclusive is an Alabama corporation formed on October 5, 2011. AF No. 1.[5] Antineekia White ("Ms. White") acted as the incorporator and is Club Exclusive's

---

[3] Club Exclusive has failed to file a corporate disclosure statement; however, the summary judgment record indicates that there is no parent or publicly-held corporation to be disclosed. No other conflict requiring the Court's recusal exists.

[4] Keeping in mind that, when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a Court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the Court has provided this statement simply to place the Court's legal analysis in the context of this particular case or controversy.

[5] Under Appendix II of the Court's Uniform Initial Order (Doc. 2) entered on May 13, 2016, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). The designation "AF" stands for admitted fact and indicates a fact offered by Liberty that it has adequately supported through citations to underlying evidence as Appendix II mandates. For Club Exclusive, more specifically, this means that even though it failed to oppose any of Liberty's factual allegations when responding to the Rule 56 Motion (*see generally* doc. 44), the Court has independently reviewed the proof (*i.e.*, docs. 36-1, 36-2, 36-3, 36-4, 36-5, and any related attachments) offered by Liberty to establish that proposed fact before accepting it as a fact admitted by Club Exclusive. The Court's numbering of admitted facts (*e.g.*,

owner, director, and president. AF No. 2. Club Exclusive is a distinct and separate entity from Ms. White. AF No. 3.1. Ms. White understood that by incorporating Club Exclusive, there would be a legal difference between her and it and that she could potentially be protected from legal liability. AF No. 3.2.

## B. The Property

On June 23, 2012, Ms. White purchased approximately 13 acres of land in rural Alabama from Bruce Hutchinson for $2,000. AF No. 4.1. This property was located at 3479 Barclay Road, Alpine, Alabama 35014 (the "Property"). AF No. 4.2. Ms. White personally owned the Property. AF No. 4.3.

Ms. White built a commercial building (the "Building") on the Property using her personal funds. AF No. 5. Ms. White did not take out a loan to assist in paying for the construction of the Building and paid for the construction with unencumbered funds. AF No. 6.

Ms. White also purchased the contents of the Building with her personal funds. AF No. 7.1. She never transferred the ownership of such contents to Club Exclusive. AF No. 7.2.

---

AF No. 1) corresponds to the numbering of Liberty's factual background as set forth in Doc. 36. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 3.2) would indicate the second sentence of paragraph 2 of Liberty's Statement of Undisputed Facts is the subject of the Court's citation to the record.

## C.     The Lease

On April 30, 2012, Ms. White leased the Property to Club Exclusive (the "Lease"). AF No. 8. The Lease's three-year term expired on the last day of April 2015, and Club Exclusive did not renew the Lease pursuant to its terms. AF No. 9. The Lease expressly states that in the event Club Exclusive continued to occupy the Property after the Lease's term expired, "whether with or against the consent of [Ms. White], such tenancies shall be a tenancy at sufferance and in no event a tenancy from month to month, or from year to year." AF No. 10.

In June 2012, Club Exclusive applied for a liquor license. AF No. 11. In the liquor license application, Club Exclusive is correctly identified as leasing the Property from Ms. White. AF No. 12. Ms. White signed the liquor license application on behalf of Club Exclusive, thereby attesting to the truthfulness of the responses given within the application in reference to the "lease/property ownership." AF No. 13.

## D.     The Application and the Policy

On April 4, 2014, Club Exclusive submitted an application for insurance for the Property (the "Application"). AF No. 14. Club Exclusive is the only one listed as an applicant. AF No. 15. In the Application's section inquiring into Club Exclusive's interest in the Property, Club Exclusive specifically marked "owner" instead of

"tenant." AF No. 16.

Ms. White provided the information contained in the Application and signed the Application. AF No. 17.1. At the time she signed the Application, the information had been filled out. AF No. 17.2. The Application explicitly states that "the undersigned is an authorized representative of the Applicant and represents that reasonable inquiry has been made to obtain the answers to questions on this application." AF No. 17.3. "He/she represents that the answers are true, correct and complete to the best of his/her knowledge." AF No. 17.4.

Based on the information included in the Application, Liberty subscribed to Policy (No. SMF 26514), which was issued to "Club Exclusive, Inc." through Southern Insurance Underwriters, Inc. ("SIU"). AF No. 18. "SIU is a managing general agent for Liberty with regard to the Policy and generally subscribes to policies on behalf of Liberty subject to certain conditions." (Doc. 36-5 at 2 ¶ 4).[6] The Policy provided certain commercial property insurance coverage to real and business personal property located on the Property for the period of October 28, 2014, to October 28, 2015, subject to the Policy's terms, limits, conditions, and exclusions. AF No. 18. Club Exclusive is the only Named Insured listed in the Policy. AF No. 19.1.

---

[6] All page references to Doc. 36-5 correspond with the Court's CM/ECF numbering system.

No other person or entity is listed as a Named Insured, Additional Insured, or any other type of insured. AF No. 19.2.

### E. The Fire

Sometime between July 14, 2015, and July 16, 2015 (after the Lease had expired), a fire burned the Building and its contents (the "Loss" or "Fire"). AF No. 20. In furtherance of its claim for the Loss, Club Exclusive submitted a Sworn Statement in Proof of Loss (the "Proof of Loss") and attached a separate Statement of Loss in support. AF No. 21.

Through the Proof of Loss and Statement of Loss, Club Exclusive made a claim for $549,000 in alleged damage to the Building, for $151,975.03 in alleged damage to business personal property in the Building (the "BPP"), and $24,033.49 for debris removal (collectively known as the "Claim"). AF No. 22.

### F. The DJ Action

On May 13, 2016, Liberty filed this declaratory judgment action (the "DJ Action") seeking a declaration that it owes no duty or obligation to Club Exclusive under the Policy. AF No. 23.1. In the DJ Action, Liberty argues, among other things, that the Policy is void because Club Exclusive misrepresented material facts in the Application, and because Club Exclusive did not have an insurable interest in the Property, Building, or the BPP. AF No. 23.2.

On June 22, 2016, Club Exclusive filed its answer, counterclaim complaint against Liberty, and crossclaim complaint against Mr. Duesenberg and Ms. Washburn. AF No. 24. In the counterclaim complaint, Club Exclusive asserts causes of action against Liberty for breach of contract, bad faith failure to investigate, bad faith failure to pay a valid claim, and negligent hiring. AF No. 25.1. The negligent hiring claim is based on the alleged wrongful acts Club Exclusive asserts against Mr. Duesenberg and Ms. White in the crossclaims. AF No. 25.2.

On August 19, 2016, Mr. Duesenberg filed a Motion To Dismiss Club Exclusive's crossclaims against him. AF No. 26. On August 22, 2016, Ms. Washburn filed a Motion To Dismiss Club Exclusive's crossclaims against her. AF No. 27. As mentioned in the procedural history section, the Court granted both Motions To Dismiss on October 24, 2016. Consequently, the Court dismissed Mr. Duesenberg and Ms. Washburn from this action. (Doc. 37 at 12).

According to Michael Evans ("Mr. Evans"), the claims counsel for the managing agency for Liberty (doc. 36-4 at 3 ¶ 2),[7] "[a]t no point in time has [Ms.] Washburn been an employee or agent of Liberty in any capacity." (*Id.* at 4 ¶ 4). Club Exclusive has attempted to dispute this agency-related fact through Ms. White's

---

[7] All page references to Doc. 36-4 correspond with the Court's CM/ECF numbering system.

affidavit (doc. 44-1), the admissibility of which the Court analyzes below.

## III. Standards

### A. Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R . CIV. P. 56(a). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (instructing that "district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or its] favor" (internal quotation marks omitted) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 2006) (en banc))). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party*." Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When, such as here, the moving party is the plaintiff, satisfying this initial Rule 56 burden means "*affirmatively* . . . support[ing] its motion with credible evidence …. [and] show[ing] that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick*, 2 F.3d at 1115 (emphasis in original) (citations and internal quotation marks omitted) (quoting *Four Parcels*, 941 F.2d at 1438). Only "[o]nce the moving party has properly

supported its motion for summary judgment, [does] the burden shift[] to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

### B.     Evidentiary Rulings

"All evidentiary decisions are reviewed under an abuse-of-discretion standard" without regard to the type of proof challenged. *General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *id.* at 143 (concluding that the Eleventh Circuit Court of Appeals committed reversible error "[i]n applying an overly 'stringent' review to [the district court's experts' testimony] ruling [because] it failed to give the trial court the deference that is the hallmark of abuse-of-discretion review"). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Estelan*, 156 F. App'x 185, 196 (11th Cir. 2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005)).

Moreover, as the Eleventh Circuit has made clear, not every incorrect evidentiary ruling constitutes reversible error:

> Auto-Owners' second argument is that it is entitled to a new trial
> on the basis of what it describes as a number of erroneous evidentiary

rulings by the district court. Evidentiary rulings are also reviewed under an abuse of discretion standard. *Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir. 1989). Moreover, even if Auto-Owners can show that certain errors were committed, the errors must have affected "substantial rights" in order to provide the basis for a new trial. *See* FED. R. EVID. 103(a). "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." *Perry*, 734 F.2d at 1446. *See also Allstate Insurance Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988).

*Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993). Therefore, even the existence of many evidentiary errors does not guarantee that the party appealing will receive a new trial. Instead, such erroneous rulings by a district court must "affect the substantial rights of the parties" for reversible error to occur. *Id.*

## IV.    Analysis

### A.    Liberty's Partial Strike Motion

Liberty seeks to strike part of Ms. White's affidavit (doc. 44-1) offered in opposition to its Rule 56 Motion. (Doc. 45 at 3-4).[3] Ms. White provided this affidavit "to supplement [her] Examination Under Oath of April 19, 2016." (Doc. 44-1 at 2 ¶ 2). Liberty contests portions of paragraphs 4 and 5 of her affidavit. There, Ms. White states:

> 4.    The agent of Liberty, Marian Washburn indicated that after the business, Club Exclusive was operational, the insurance would be

---

[3]  All page references to Doc. 45 correspond with the Court's CM/ECF numbering system.

switched to another type of policy of insurance.

5.    After completing my Application for Commercial Insurance on April 4, 2014, <u>Liberty's agent, Marian Washburn</u> asked that I fax a copy of the deed to the land Club Exclusive was to be built on, to her office. I complied with her request.

(Doc. 44-1 at 2 ¶¶ 4-5 (emphasis added)).[4]

Liberty contends that Ms. White's passing references to Ms. Washburn as Liberty's agent are conclusory as they are offered "without providing a sufficient basis to support such statements or establish[ing] [Ms. White's] personal knowledge of [such facts]." (Doc. 45 at 3). Rule 56(c)(4) provides:

**(4)** *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion <u>must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated</u>.

FED. R. CIV. P. 56(c)(4) (emphasis added).

Liberty cites to several Eleventh Circuit cases which confirm that striking and/or disregarding conclusory information contained in a non-compliant Rule 56(c)(4) affidavit is appropriate. (*See* Doc. 45 at 5 (citing collection of cases)); *see also, e.g.*, *Rogers v. Evans*, 792 F.2d 1052, 1062 n.9 (11th Cir. 1986) (finding "proper" district court's striking of an affidavit "phrased in conclusory terms without

---

[4]    In her affidavit, Ms. Washburn disputes that she ever received a copy of the deed from Ms. White. (Doc. 46-1 at 3 ¶ 6). Ms. Washburn also states that she never provided Liberty with a copy of the deed. (*Id.* ¶ 7). (**NOTE:** All page references to Doc. 46-1 correspond with the Court's CM/ECF numbering system.)

citing facts"); *Evans v. Books-A-Million*, 762 F.3d 1288, 1295 (11th Cir. 2014) (affirming district court's decision to strike certain statements as "conclusory and speculative"); *id.* ("Evans'[s] affidavit did not provide specific, supporting facts regarding, for example, the amount of other employees' salaries compared to hers, the details of other employees' financial advancement, or Mr. Dickson's job performance, duties and evaluations."); *Neibert v. Computer Scis. Corp.*, 621 F. App'x 585, 593 (11th Cir. 2015) (agreeing with district court's determination that declaration was "wholly insubstantial" and finding that "the[] bare assertions" contained within it failed to "give[] rise to a genuine dispute of material fact"); *cf. Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (agreeing with the Ninth and D.C. Circuits "that Rules 703 and 705 do not alter the requirement of FED. R. CIV. P. 56[(c)(4)] that an affidavit <u>must set forth specific facts in order to have any probative value</u>") (emphasis added).[5]

Consistent with the foregoing authorities, Liberty argues:

> Ms. White provides no basis for her statement that Ms. Washburn was Liberty's agent. (*see generally* Doc. 44-1). She does not explain how she would, or could, know that Ms. Washburn is Liberty's agent. She does not identify any other specific facts indicating Ms. Washburn was acting on Liberty's behalf. Rather, she makes a passing, conclusory statement that Ms. Washburn is Liberty's agent. Such unsupported and

---

[5] When the Eleventh Circuit decided *Evers*, FED. R. CIV. P. 56(e) addressed summary judgment affidavits.

speculative statements are in direct contradiction to those allowed under Rule 56(c)(4). Rather, they are the type of unsupported and non-probative conclusory claims addressed in Rule 56(e) and should be stricken from evidence.

(Doc. 45 at 5-6).

Club Exclusive's opposition to the Partial Strike Motion makes no effort to address any of the cases cited by Liberty. (*See generally* Doc. 47). Instead, after a brief introduction, Club Exclusive discusses the various types of agents that can arise under Alabama insurance law–general, special, soliciting, and independent (or broker). (Doc. 47 at 3-7).

In an effort to show that Ms. White "may offer her conclusion or opinion that Marian Washburn was an [a]gent of Liberty[.]" (doc. 47 at 8 (emphasis omitted)), Club Exclusive only briefly mentions FED. R. CIV. P. 56(c)(4). *Id.* Club Exclusive spends a substantial amount of time addressing the meaning of FED. R. EVID. 701 (opinion testimony by lay witnesses) and FED. R. EVID. 104 (preliminary questions including establishing an adequate foundation). (Doc. 47 at 8-10).

Club Exclusive also references portions of Ms. White's multiple oral examinations reflecting that she worked with Ms. Washburn to obtain the Policy.[6] (Doc. 47 at 12-13). More specifically, Club Exclusive relies upon the following

_____

[6] Ms. White's first examination under oath occurred on September 22, 2015. (Doc. 46-4 at 2). The second one occurred on April 19, 2016. (Doc. 36-1 at 2). (**NOTE:** all page references to Docs. 46-4 and 36-1 correspond with the Court's CM/ECF numbering system.)

excerpts (and attorney commentary) to support her affidavit:

The testimony [from her first Examination Under Oath] is clear White contacted The Insurance Place in Birmingham, Alabama seeking insurance on the subject real property. White's testimony regarding these transactions include the following:

'Q:    Okay. And then you left Insurance USA and you went to a company out of Birmingham. And would that be Insurance Place Alabama?'

Washburn chose the amount of coverage to be applied for. White further testified:

'Q:    Okay. Why did you choose 500 – If you'll turn to the next page under Property Section. Why did you choose $500,000 as the amount of the insurance?

A:    I didn't choose that. Marian and them chose that. I gave her the square foot of the building. She asked me questions on – She asked me questions on, like, the general application, how big was the club, and they – That's what they came up with. I didn't choose that.'

Further, White testified during her second Examination Under Oath on April 19, 2016 as follows:

'Q:    (By Mr. Mast:) Do you recognize Exhibit 8?

A:    Yes, I do.

Q:    Great. What is it?

A:    It's my insurance application.

Q:    All right. And when you say it's your insurance application, is that the application for Club Exclusive, Inc.?

A: Yeah, for the commercial insurance for Club Exclusive, Inc.

Q: All right. Turn with me, if you would, to page 4. Now, at the bottom of the page, you'll see 'Producer Signature' and then 'Applicant Signature'. Under 'Applicant Signature', is that your signature?

A: Yes. It is.

Q: Okay. And when did you sign this document?

A: It has on the 4th, but that's not my – I didn't date this. This is not my handwriting with the date.

Q: All right. Would it have been on or – sometime in April of 2014 though that you applied for insurance?

A: Yes.

Q: All right. So it may or may not have been the 4th, you just don't know?

A: I don't know.

(Doc. 47 at 11-13 (citations omitted)).

Club Exclusive maintains that "[b]ecause [Ms.] White dealt only with [Ms.] Washburn, and was issued a policy through Liberty, [Ms.] White could reasonably conclude that [Ms.] Washburn was an agent for Liberty." (Doc. 47 at 14). Club Exclusive also relies upon a "Dear Agency Partner" letter (doc. 47-1) to demonstrate that "[Ms.] Washburn could reasonably be viewed as an agent for both Club Exclusive and for Liberty." (Doc. 47 at 14).

Club Exclusive indicates in its brief that this undated letter from SIU (the managing general agent for Liberty (doc. 36-5 at 2 ¶ 4)) was attached to the Policy that Ms. White received on behalf of Club Exclusive. (Doc. 47 at 14 n.1). The letter is addressed to Insurance Place (Ms. Washburn's company (doc. 46-1 at 2 ¶ 3)), identifies Club Exclusive as the insured, and states in the salutation "Dear Agency Partner". The correspondence includes underwriter contact information for SIU employees and also states:

> We realize that you, as a customer, have choices and we appreciate your decision to choose Southern Insurance Underwriters, Inc.
>
> We hope you find this policy to be correct and as you requested. Please review and if there are any changes or for future policy endorsement, please contact us. . . .
>
> Thank you for your business and please contact me to quote your next account.

(Doc. 47-1 at 1).

> Club Exclusive ends this subsection by stating:
>
> Given the fact that [Ms.] White's testimony referenced no other insurance contract, [Ms.] Washburn could reasonably be viewed as an agent for both Club Exclusie and for Liberty. At the very least, [Ms.] Washburn should be viewed as a 'special agent' with authority to take applications from potential insured's [sic] and provide those applications to the insurer. It is respectfully submitted that [Ms.] White's conclusion in her [a]ffidavit met the requirements for admissibility under Rule 701.

(Doc. 47 at 14-15).

Club Exclusive asserts in the final subsection of its brief that regardless of how Ms. White describes Ms. Washburn in her affidavit, "there is an issue of fact as to any agency relationship and that issue is a matter to be determined by the jury." (Doc. 47 at 15). Club Exclusive reiterates that Ms. White's conclusions about Ms. Washburn's status as an agent of Liberty are admissible pursuant to FED. R. EVID. 701 and that "the issue as to agency is a question of fact for the jury." (Doc. 47 at 16).

In its reply, Liberty points out that Club Exclusive's opposition to the Partial Strike Motion was untimely filed.[7] (Doc. 48 at 2 n.1).[8] Regardless of that procedural mistake, Liberty contends that Club Exclusive has not made an adequate showing of Ms. White's personal knowledge to factually support Ms. Washburn's role as an agent of Liberty. Liberty maintains that Ms. White's dealing exclusively with Ms. Washburn to procure the Policy from Liberty, Ms. Washburn's assisting in the application process, Ms. Washburn's requesting a copy of the deed from Ms. White, and Liberty's issuance of the Policy, including the "Dear Agency Partner" letter are simply not enough.

---

[7] Liberty has indicated in a footnote that the Court has the authority to strike Club Exclusive's entire opposition due to this procedural error. Assuming (without deciding) that Liberty is correct, this Court elects not to exercise its discretion in such a suggested manner, especially as the Court has considered Liberty's untimely-filed evidence attached to its reply in support of its Rule 56 Motion.

[8] All page references to Doc. 48 correspond with the Court's CM/ECF numbering system.

As legal support, Liberty cites to *Ballard v. Lee*, 671 So. 2d 1368 (Ala. 1995), *overruled on other grounds by State Farm Fire and Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998). In *Ballard*, the plaintiff insured attempted to show that the agent concurrently represented him as well as the insurer. *Ballard*, 671 So. 2d at 1371. Relying upon Ala. Code § 27-7-1(a) (defining "Agent" and "Broker"), the *Ballard* Court explained:

> In this case, it is undisputed that Carter [the claimed dual agent] and the Syndicate [the insurer] shared no express contractual relationship. Indeed, Ballard concedes that liability cannot be based on the principle of *respondeat superior*. After assuming the responsibility, at Ballard's request, to locate an insurer, <u>Carter served at all relevant times as a "middleman" for the transactions between the Syndicate and Ballard</u>. Moreover, <u>no reasonable construction of the communications transpiring among the parties supports the proposition that Carter had either actual or apparent authority to bind the Syndicate. Thus, we are compelled to conclude that Carter's role throughout these transactions was that of a broker</u>.

> Ordinarily, "an insurance broker represents the insured and is not considered an agent of the insurer." *Lampkin v. Kelly*, 771 S.W.2d 953, 954 (Mo. App. 1989). A broker usually acts *solely* as the insured's agent and "has a license to 'hunt' for a suitable policy without having any prior representation contract with any particular insurer." M. Pock, *Insurance*, 45 Mercer L. Rev. 253, 255 n. 15 (1993); *see, also*, J. Appleman, *Insurance Law and Practice* § 8727 (1981). Only "special conditions or circumstances in a particular case [will] warrant the inference that a broker is the agent of the insurer." *Lampkin*, 771 S.W.2d at 954. These rules are essentially codified in Ala. Code 1975, § 27-7-1(a)(2), which expresses the intent of our legislature with regard to concurrent agency, namely, that <u>in the usual case, a broker will *not* be regarded as "an agent of the insurer</u>." *Id.*

671 So. 2d at 1372 (emphasis by underlining added) (citation omitted).

The *Ballard* court acknowledged that "a broker sometimes performs certain functions that benefit the insurer, such as delivering the insurer's policy to the insured, collecting premiums from the insured, and forwarding the proceeds of the premium to the insurer . . . ." *Id.* However, the court reasoned that "these [foregoing] activities are expressly, or by clear implication, ascribed to *brokers* [under § 27-7-1(a)(2)]."[9] 671 So. 2d at 1372 (emphasis in original). Consequently, to create a triable issue as to dual *agency*, "the plaintiff's rebuttal evidence must relate to activities of the broker *other* than those mentioned in § 27-7-1(a)(2)." 671 So. 2d at 1372-73 (emphasis in original).

The *Ballard* court then found that the only remaining evidence that possibly fit into this category was the broker's "assisting Ballard in obtaining a satisfactory inspection report." 671 So. 2d at 1373. Ultimately, the court concluded that this activity "was merely an 'aid' in the procurement of coverage, as provided by § 27-7-

---

[9]  At the time of the *Ballard* decision, § 27-7-1(a)(2) defined a broker as:

> A natural person, partnership or corporation who, on behalf of the insured, for compensation as an independent contractor, for commission or fee and not being an agent of the insurer, solicits, negotiates or procures insurance or the renewal or continuance thereof, or in any manner aids therein, for insureds or prospective insureds other than himself or itself. Brokers cannot bind the insurer and all business produced must be countersigned by a resident agent of the insurer accepting the risk.

Ala. Code § 27-7-1(a)(2).

1(a)(2)" and insufficient to create a triable issue as to dual agency. *Id.*

The Court acknowledges that, since *Ballard*, the Alabama Legislature has amended Title 27 and § 27-7-1 no longer has separate definitions for "Agent" and "Broker". *See* Ala. Code § 27-7-1; *see also* Ala. Act 2001-702 (S.B. No. 427); *Carolina Cas. Ins. Co. v. Miss Deanna's Child Care-Med Net, L.L.C.*, 869 So. 2d 1169, 1175 n.4 (Ala. Civ. App. 2003) ("Although § 27-7-1, Ala. Code 1975, was amended effective January 1, 2002, so as to delete the statutory definitions of 'agent' and 'broker' discussed in *Ballard*, the incidents on which this action is based occurred before the effective date of that amendment."). Nonetheless, Liberty states that it "is unaware of any cases interpreting the current version of § 27-7-1 [in a manner inconsistent with *Ballard*] or discussing how, if at all, the changes to the statute affect the precedential nature of these earlier decisions." (Doc. 48 at 4 n.2).

This Court likewise has not located any legal authority that disagrees with *Ballard*'s dual-agent analysis for conduct occurring after January 1, 2002, the effective date of amended § 27-7-1. In fact, at least one Alabama authority implies that *Ballard* is still good law post-amendment. *See Burlington Ins. Co. v. Fluid Servs., Inc.*, 13 So. 3d 965, 969-970 (Ala. Civ. App. 2008) (citing to *Ballard* for the proposition that "under Alabama law, brokers are often considered agents of the insured"). Under such circumstances, the Court finds that *Ballard* retains persuasive value in its discussion of insurance agents and brokers despite its reliance upon an earlier version

of § 27-7-1.

Liberty also relies upon *Gulf Gate Mgmt. Corp. v. St. Paul Surplus Lines Ins. Co.*, 646 So. 2d 654 (Ala. 1994). (Doc. 48 at 5). In *Gulf Gate*, the Supreme Court of Alabama explained:

> Under certain circumstances, however, an independent broker may act as an agent for both the insured and the insurer. *Strickland*. An insurer's liability for the fraud of an independent agent or broker is predicated solely upon actual or apparent authority conferred upon the agent/broker by the insurer to make representations on the insurer's behalf; <u>however, an independent agent or broker can never impose liability upon the agent or broker's principal for representations that are not authorized by the principal</u>. *Strickland*. <u>An agent's apparent authority must be based on the conduct of the principal and not on the conduct of the agent</u>, *Gray v. Great America Reserve Ins. Co.*, 495 So. 2d 602 (Ala. 1986).

*Gulf Gate*, 646 So. 2d at 659 (emphasis added). As Liberty contends, because Club Exclusive maintains that "Ms. White only interacted with Ms. Washburn" (doc. 48 at 5), no underlying evidence to support apparent authority can exist given *Gulf Gate*. Liberty further points out that the record lacks any underlying evidence *from Liberty* of Ms. Washburn's actual authority as its agent. (Doc. 48 at 5).

Liberty additionally addresses the "Dear Agency Partner" letter. As Liberty maintains, when considering the entire context of the letter, it is clear that Ms. Washburn (on behalf of Club Exclusive) is the "Agency Partner" with whom Liberty is communicating and thanking for its business. (Doc. 48 at 7).

Finally, Liberty discusses Club Exclusive's argument that agency is a jury

question. (Doc. 48 at 7). As Liberty counters, its Partial Strike Motion "is directed at the admissibility and weight of Ms. White's statement concerning agency, not the underlying question of whether Ms. Washburn was Liberty's agent." (Doc. 48 at 7).

Having fully considered both sides' positions, the Court finds that Liberty's Partial Strike Motion is due to be granted. Consistent with *Ballard* and *Gulf Gate*, the activities that Ms. White relies upon in her affidavit and in her oral examinations are insufficient to support her statements that Ms. Washburn was Liberty's agent. In particular, Ms. White's affidavit lacks a reference to any affirmative conduct *by Liberty* that created the impression that Ms. Washburn was its actual or apparent agent.

For example, Liberty did not contact Ms. White and ask her to fax the deed to Ms. Washburn. Alternatively, to the extent that Liberty desired to have a copy of the deed, Ms. Washburn's request for the deed from Ms. White is comparable to the broker's dealings with the inspection report in *Ballard*. Akin to that inspection report, the deed–requested by Ms. Washburn–facilitated the procurement of insurance from Liberty on behalf of Club Exclusive. Consequently, Ms. White's faxing the deed to Ms. Washburn is (without more) inadequate to show that Ms. Washburn was acting as the actual or apparent agent of Liberty.

As for the "Dear Agency Partner" letter, the Court agrees with Liberty that this correspondence does not validate the challenged portions of Ms. White affidavit.

Importantly, nowhere does Ms. White mention this correspondence in her affidavit. Also, Club Exclusive does not refer to a discussion of this letter in either one of Ms. White's oral examinations. Therefore, the Court cannot verify whether Ms. White ever even had any personal knowledge of it.[10] While Club Exclusive's counsel has represented in a footnote that Ms. White received it, "[s]tatements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980).[11]

Alternatively, even if the Court were to assume that Ms. White received the "Dear Agency Partner" letter at the same time as the Policy, the contents of the correspondence do not straightforwardly support Ms. White's statements about Ms. Washburn's status as Liberty's agent or otherwise substantiate Ms. Washburn's actual or apparent authority. Also, Club Exclusive has failed to cite to any record evidence from Ms. White that reasonably explains why she interpreted the letter in such a manner. Therefore, the Liberty letter (even if Ms. White did, in fact, receive it) does not defeat the Partial Strike Motion for these additional reasons.

Finally, Club Exclusive generally observes that "issue of whether [Ms.] Washburn is described as an agent by [Ms.] White is of little significance because

---

[10] Additionally, Liberty asserts that "this letter was not produced to [it] 'through discovery,' as no discovery was conducted in this case and Club Exclusive failed to file its initial disclosures." (Doc. 48 at 6).

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

under Alabama law the issue of agency is a question of fact for determination by the jury." (Doc. 47 at 15 (citing *Oliver v. Taylor*, 394 So. 2d 945 (Ala. 1981)). In this instance, Club Exclusive's reference to that common Alabama legal principle places the triable cart before the evidentiary horse. To illustrate its point, Club Exclusive juxtaposes Ms. White's agency-related conclusion about Ms. Washburn (the evidentiary sufficiency of which Liberty challenges) with the competing affidavit of Mr. Evans. *Id.* However, absent the admissibility of Ms. White's conclusion, there is no triable dispute regarding Ms. Washburn's agency status. Moreover, because Ms. White's conclusion is nothing more than *ispe dixit*, it is deficient under FED. R. CIV. P. 56(c)(4) and, likewise, is inadmissible. Thus, Liberty has successfully shown why this Court must strike those conclusory portions of Ms. White's affidavit about Ms. Washburn's role as an agent for Liberty.

**B.     Liberty's Rule 56 Motion**

**1.     Club Exclusive's Lack of an Insurable Interest in the Property or the BPP in the Building at the Time of the Loss Voids the Policy.**

Liberty contends that the Policy is void because Club Exclusive did not have an insurable interest in the Property or the BPP in the Building. (Doc. 36 at 13-15);[12]

---

[12]  All page references to Doc. 36 correspond with the Court's CM/ECF numbering system.

(Doc. 46 at 3-7).[13] The Court agrees.

Concerning the parameters of an insurable interest pertaining to property, Ala.

Code § 27-14-4 provides:

> (a) No contract of insurance of property or of any interest in property, or arising from property, shall be enforceable as to the insurance except for the benefit of persons having an insurable interest in the things insured as at the time of the loss.

> (b) 'Insurable interest,' as used in this section, means any actual, lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction or pecuniary damage or impairment.

> (c) The measure of an insurable interest in property is the extent to which the insured might be damnified by loss, injury, or impairment thereof.

Ala. Code § 27-14-4(a)-(c). Further, "a party cannot collect insurance upon property in which he has no insurable interest." *N. British & Mercantile Ins. Co. v. Sciandra*, 54 So. 2d 764, 770 (Ala. 1951); *see also Nat'l Sec. Fire & Cas. Ins. Co. v. Brannon*, 253 So. 2d 777, 781 (Ala. Civ. App. 1971) ("It seems to be settled law everywhere that a policy of insurance is void [*a*]*b initio*, unless the insured has an insurable interest in the property[.]").

In establishing Club Exclusive's lack of an insurable interest, Liberty points to the undisputed facts that Club Exclusive did not own the Property and that Club Exclusive's Lease had expired at the end of April 2015. (Doc. 36 at 14-15); (Doc. 46

---

[13] All page references to Doc. 46 correspond with the Court's CM/ECF numbering system.

at 3). Consequently, at the time of the Loss–occurring between July 14, 2015, and July 16, 2015–Club Exclusive was a tenant by sufferance.

Relying upon *Fid. Phenix Fire Ins. Co. of N.Y. v. Raper*, 6 So. 2d 513 (Ala. 1941), Liberty maintains that in possessing the Property merely as a tenant by sufferance, Club Exclusive had no valid insurable interest. *See Raper*, 6 So. 2d at 514 ("The law is clear that a person with no interest in the land other than that of a tenant by sufferance, or a squatter, or a trespasser, has no insurable interest in the property." (citing *Royal Exchange Assur. of London, England v. Almon*, 89 So. 76, 78 (Ala. 1921))); *see also Almon*, 89 So. at 78 ("Just bare possession of the barn with no facts averred except being the husband, to show right of possession and use of the barn, is not sufficient interest in the barn by plaintiff to be insured. It is not an insurable interest.").

Likewise, the undisputed facts show that Ms. White, and not Club Exclusive, held the insurable interest with respect to the BPP within the Building when the Loss occurred. Ms. White confirmed under oath that she paid for the BPP with her personal funds and never transferred ownership of such items to Club Exclusive. (*See generally* Doc. 36-1 at 33-34 (Ms. White's examination under oath taken on Apr. 19, 2016)).

In opposition, Club Exclusive contends that Ms. White never had the intent to evict it from the Property because it was her business. (Doc. 44 at 15). Club Exclusive also urges that Ms. White served as Club Exclusive's promoter or initial incorporator.

(Doc. 44 at 16-17). However, in presenting both of these arguments, Club Exclusive does not ever explain how either fact, if proven to a jury, transforms its lack of an insurable interest into an insurable one. Therefore, the Court rejects these theories due to Club Exclusive's failure to provide any on-point development. *See Flanigan's Enters., Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument), *superseded on other grounds as stated in Buehrle v. City of Key West*, 813 F.3d 973, 980 n.3 (11th Cir. 2015); *Ordower v. Feldman*, 826 F.3d 1569, 1576 (7th Cir. 1987)(stating that an argument made without citation to authority is insufficient to raise an issue before the court)."

Club Exclusive also asserts that the issue of an insurable interest is moot. (Doc. 44 at 15). Club Exclusive bases this upon its belief that Liberty had knowledge that the Property was titled in Ms. White's name prior to the issuance of the Policy. *Id.* Club Exclusive attributes Liberty's knowledge to the fact that Ms. White faxed a copy of the deed to Ms. Washburn before the issuance of the Policy. Essential to Club Exclusive's position is triable proof that Ms. Washburn was an agent for Liberty.

However, as analyzed in the Partial Strike Motion section, the record lacks competent evidence that Ms. Washburn ever served as an agent of Liberty in any capacity. Additionally, as the party relying upon an agency relationship, Club Exclusive has the burden to prove it. *See Johnson v. Shenandoah Life Ins. Co.*, 281

So. 2d 636, 640 (Ala. 1973) ("The burden of proving an agency rests upon the party asserting its existence."). Club Exclusive has failed to provide admissible evidence from which a reasonable jury could conclude that Ms. Washburn was an agent of Liberty. Consequently, Club Exclusive has not shown that Liberty had knowledge of Club Exclusive's lack of an insurable interest before the Policy issued.

Accordingly, Liberty's Rule 56 Motion concerning its right to rescind the Policy as void due to Club Exclusive's lack of an insurable interest at the time of the Loss is due to be granted under § 27-14-4.

> **2.** **Club Exclusive's Innocent Misrepresentation of Its Ownership Interest in the Property Does Not Void the Policy.**

Liberty also argues that Club Exclusive's misstatement in the Application about its ownership interest in the Property provides a second ground for voiding the Policy. (Doc. 36 at 11-13); (Doc. 46 at 7-11). As discussed below, Liberty has not met its summary judgment burden with respect to this argument.

Concerning the contents of an application for insurance, Ala. Code § 27-14-7(a) provides:

> All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by, or in behalf of, the insured or annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract <u>unless</u> either:

(1) Fraudulent;

(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

*Id.* (emphasis added); *see also In re HealthSouth Corp.*, 308 F. Supp. 2d 1253, 1269-70 (N.D. Ala. 2004) (recognizing that an insurer can rescind a policy under Alabama law if an insured's misrepresentation meets § 27-14-7(a)(1), (2), or (3)). Thus, Alabama law does not require proof of an insured's intent to deceive when answering a question erroneously on an application to void an insurance policy. Instead, "even if innocently made, an incorrect statement that is material to the risk assumed by the insurer or that would have caused the insurer in good faith not to issue the policy in the manner that it did provides a basis for the insurer to avoid the policy." *Alfa Life Ins. Corp. v. Lewis*, 910 So. 2d 757, 762 (Ala. 2005). Additionally, an insured is bound by the answers completed by another person on an application so long as the applicant had an opportunity to review them before signing the document. *See Nationwide Mut. Fire Ins. Co. v. Pabon*, 903 So. 2d 759, 767 (Ala. 2004) ("Because Pabon was given the opportunity to review the answers on the insurance

application before she signed it, we reject the arguments that Nationwide's agent created the inaccuracies on the application and that Nationwide waived its right to defend on the basis that the application contained innocent but material misrepresentations.").

The materiality of a misrepresented fact on an application for insurance is customarily a question for a jury to resolve. *Mega Life and Health Ins. Co. v. Pieniozek*, 585 F.3d 1399, 1404 (11th Cir. 2009). Nonetheless, as Liberty points out, Alabama law recognizes some exceptions to the general rule that materiality of a fact reported on an application is typically a triable issue. *See, e.g., Integon Nat. Ins. Co. v. MT & R Enterprises, Inc.*, No. 4:10-CV-02021-HGD, 2012 WL 6043504, at *4 (N.D. Ala. Nov. 8, 2012) (analyzing § 27-14-7 and citing series of Alabama cases holding that certain misrepresentations can be material as a matter of law).

One such exception is when a misrepresentation is made about an insured's ownership interest. For example, in *Camden Fire Ins. Ass'n v. Landrum*, 156 So. 832 (Ala. 1934), the Supreme Court of Alabama held that the insured's failure to disclose an adverse occupant possessing the property "was material, and, as [a] matter of law, increased the risk of loss under the law of fire insurance." *Camden*, 156 So. at 833. Similarly, in *Gunn v. Palatine Ins. Co.*, 114 So. 690 (Ala. 1927), the Supreme Court of Alabama recognized that "the ownership of a mere life estate in the insured will not be sufficient to meet these provisions of the policy" and "that, as a matter of law, the

ownership of only a life estate, in view of the warranties as to ownership herein set out, was such as to increase the risk of loss . . . ." *Gunn*, 114 So. at 692.

Liberty then relies on the undisputed affidavit of Hank Butler ("Mr. Butler"), the managing underwriter for SIU (doc. 36-5 at 2 ¶ 2), to establish the materiality of ownership with respect to this Policy. (*See id.* at 4 ¶ 12 ("SIU considers the ownership interest in the Property to be a <u>material</u> fact, as evidence by the Application's question addressing the subject.") (emphasis added)).

The Court acknowledges that incorrectly answering a material question about ownership on an application may allow an insurer to rescind an insurance contract as a matter of law. However, the Court disagrees with Liberty that it has affirmatively shown a basis for that type of relief here. Instead, the Court finds that Liberty has waived its right to void the Policy for misrepresentation, regardless of the materiality.

In *Pabon*, the Supreme Court of Alabama set out the subparts to § 27-14-7 of the Alabama Code and explained:

> Under this Code section, it is not necessary that the insured have made the misrepresentation with an intent to deceive; <u>even if innocently made, an incorrect statement that was material to the acceptance of the risk assumed by the insurer or that would have caused the insurer in good faith not to issue the policy provides a basis for the insurer to avoid the policy</u>. *See, e.g., Taylor v. Golden Rule Ins. Co.*, 544 So. 2d 932 (Ala. 1989); § 27-14-7, Ala. Code 1975. To invoke § 27-14-7, <u>an insurer need establish only that a misrepresentation in the application was a material contributing influence that induced the insurer to issue the policy</u>. That the insurer could make its own investigation does not lessen its right to rely on the representations in the application. *See Reliance Life Ins. Co.*

*v. Sneed*, 217 Ala. 669, 117 So. 307 (1928).

*Pabon*, 903 So. 2d at 766-67 (emphasis added). Thus, § 27-14-7(a)(2)–as interpreted by *Pabon*–authorizes an insurer to rescind a policy on account of an innocent but, nonetheless, material misstatement made in an application. However, *Pabon* does not signify that § 27-14-7(a)(2) trumps conflicting contractual language that is less favorable to the insurer on the right to rescind. Indeed, *Pabon* does not discuss the scope of the contractual provision permitting rescission at all. Instead, the waiver that the plaintiffs sought in *Pabon* was related to errors that they claimed the insurer's agent committed on the application. *See Pabon*, 903 So. 2d at 767 ("Because Pabon was given the opportunity to review the answers on the insurance application before she signed it, we reject the arguments that Nationwide's agent created the inaccuracies on the application <u>and that Nationwide waived its right to defend on the basis that the application contained innocent but material misrepresentations</u>.") (emphasis added).

Moreover, this Court's conclusion is consistent with the Eleventh Circuit's binding analysis in *State Farm Fire & Cas. Co. v. Oliver*, 854 F.2d 416 (11th Cir. 1988). The Eleventh Circuit determined in *Oliver* that, despite the express wording of § 27-14-7, an insurer could waive its right to rescind a policy due to an insured's innocent misrepresentation depending upon the language used in the insurance contract. *See Oliver*, 854 F.2d at 419 (rejecting insurer's argument that "the provisions of § 27-14-7 become a part of every insurance policy and cannot be overridden

contractually"); *id.* ("[W]e agree with the [insureds] that State Farm, by setting a standard for judging the Olivers' misrepresentations and concealments that requires intent, has waived its defenses of innocent misrepresentation under § 27-14-7(a)(2) and (3)."). As the Eleventh Circuit reasoned, "[h]ere, the policy set standards for judging misrepresentations and concealments that are more favorable to the insured than that afforded by the statute: the contract provides that the policy will be voided for *intentional* misrepresentations." *Id.* (emphasis in original). "[O]nce State Farm has set its own standard by contract for judging misrepresentations and concealments, it cannot rely on a statute that imposes more stringent requirements on an insured." *Id.*

In addressing this particular issue, Liberty does not (and cannot) argue that the language of the Application allows it to rescind on the basis of an *innocent* misrepresentation. The pertinent provision contained in the Application plainly states:

> ANY PERSON <u>WHO KNOWINGLY AND WITH INTENT TO DEFRAUD</u> ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND . . . CIVIL PENALTIES.

(Doc. 46-1 at 8 (emphasis by underlining added)). Thus, Liberty has contractually restricted its ability to rescind this Policy upon a showing that the insured engaged in knowing and/or intentional fraudulent conduct.

Although Liberty argues that *Oliver* is "no longer binding or persuasive law" in light of *Pabon*, the Court disagrees. (Doc. 46 at 10-11). First, as pointed out above, *Pabon* does not deal <u>in any manner</u> with the type of § 27-14-7(a)(2) and (3) waiver that *Oliver* addresses. Second, this Court has been unable to find any state or federal case authority holding that *Pabon* implicitly overrules *Oliver*. Third, as recently as 2013, the Middle District of Florida (when analyzing an insurance contract arising under Florida law) acknowledged the continuing viability of *Oliver*, but distinguished it on the basis that "[t]he language present in the policy . . . is not so limited[–][i]t provides that the Policy shall be void at its inception not just for fraud and intentional concealment, <u>but also for misrepresentation of material fact</u>." *Zurich Am. Ins. Co. v. Diamond Title of Sarasota, Inc.*, No. 8:10-CV-383-T-30AEP, 2013 WL 6283684, at *4 (M.D. Fla. Dec. 4, 2013) (emphasis added); *see also id.* at *3 (providing that policy is "VOID AT INCEPTION" upon the DISCOVERY OF ANY FRAUD, INTENTIONAL CONCEALMENT, OR MISREPRESENTATION OF MATERIAL FACT") (emphasis in original) (internal quotation marks omitted).

Accordingly, Liberty's Rule 56 Motion concerning its right to rescind the Policy as void under § 27-14-7(a)(2) and (3) on account of Club Exclusive's ownership-related misrepresentation made on the Application is due to be denied.

### 3. Liberty Is Entitled to Summary Judgment on Club Exclusive's Counterclaims.

Club Exclusive has alleged four counterclaims against Liberty: (1) breach of contract; (2) bad faith refusal to investigate; (3) bad faith failure to pay a claim; and (4) negligent hiring. As explained below, Liberty is entitled to summary judgment as to each one.

### a. Because the Policy Is Void, Club Exclusive Cannot Maintain a Breach of Contract Claim Against Liberty.

Club Exclusive's first counterclaim against Liberty is for breach of contract. (Doc. 12 at 47-52 ¶¶ 42-46). An action for breach of contract require proof of: "(1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105 (Ala. 2002) (citing *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 303 (Ala. 1999)). Club Exclusive cannot satisfy the first *prima facie* element–the existence of a valid contract–because without an insurable interest, the Policy is void as a matter of law. Thus, Liberty's Rule 56 Motion is due to be granted with respect to Club Exclusive's counterclaim for breach of contract.

### b. Because Club Exclusive Has No Viable Breach of Contract Claim, No Bad-Faith Liability Against Liberty Is Cognizable.

Club Exclusive asserts two bad-faith counts against Liberty. (*See* Doc. 12 at

52-57 ¶¶ 47-53 (refusal to investigate and/or pay a valid claim); *id.* at 57-61 ¶¶ 54-61 (failure to pay)). In collectively addressing the elements of bad-faith liability against an insurer–whether premised upon the failure to pay an insurance claim or upon the failure to investigate an insurance claim–the Supreme Court of Alabama has summarized:

> We have repeatedly held that the tort of bad-faith refusal to pay a claim has four elements—(a) <u>a breach of insurance contract</u>, (b) the refusal to pay claim, (c) the absence of arguable reason, (d) the insurer's knowledge of such absence—with a conditional fifth element: "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." *Bowen*, 417 So. 2d at 183. Thus, for the tort of bad-faith refusal to pay, "[r]equirements (a) through (d) represent the 'normal' case. Requirement (e) represents the 'abnormal' case." *Grissett*, 732 So. 2d at 976. But the tort has always been *one*.

*State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 258 (Ala. 2013) (emphasis by underlining added). Therefore, regardless of whether a plaintiff is pursuing a traditional bad-faith claim or a non-traditional one, the party must establish breach of an insurance agreement as the initial element. *See Slade*, 747 So. 2d at 318 ("We think it clear that these authorities limit bad-faith liability to those cases in which the insured is entitled to benefits under the policy."); *id.* ("Although this Court has recognized several abnormal cases of bad faith, that recognition did not eliminate the requirement that the plaintiff prove an entitlement to benefits under the insurance policy."). Thus, without any cognizable claim for breach of the Policy, Liberty's Rule

56 Motion is due to be granted with respect to Club Exclusive's counterclaim(s) premised upon bad-faith liability.

> **c.    Club Exclusive's Negligent Hiring Claim Is Not Cognizable Because It Cannot Establish a Wrongful Act by an Employee or Agent of Liberty.**

Finally, Club Exclusive counterclaims that Liberty is liable because it negligently hired, trained, monitored, and/or supervised Mr. Duesenberg and Ms. Washburn. (Doc. 12 at 68-70 ¶¶ 69-72). After explaining in detail several of its prior decisions, the Supreme Court of Alabama recognized in *Jones Exp., Inc. v. Jackson*, 86 So. 3d 298 (Ala. 2010), that "implicit in the tort of negligent hiring, retention, training, and supervision is the concept that, as a consequence of the employee's incompetence, the employee committed some sort of act, wrongdoing, or tort that *caused* the plaintiff's injury." *Id.* at 305 (emphasis in original); *see also United Steelworkers of America AFL–CIO–CLC v. O'Neal*, 437 So. 2d 101, 103 (Ala. 1983) ("In a joint action in tort for misfeasance or malfeasance against an agent and his principal, where *respondeat superior* is the sole basis of recovery, a verdict in favor of the agent works an automatic acquittal of the principal so that a verdict against him must be set aside." (citing *Larry Terry Contractors, Inc. v. Bogle*, 404 So. 2d 613, 614 (Ala. 1981))); *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008) ("Because we hold that the Jays' claims alleging wrongful conduct

on the part of any employees or officers of Peoples Bank or Alabama Catfish were properly dismissed on summary judgment, their negligent- and/or wanton-supervision claim is without merit.").

Consistent with the foregoing cases, essential to Club Exclusive's negligent hiring or training claim is a showing of wrongful conduct on the part of either Mr. Duesenberg or Ms. Washburn. However, as explained above, all claims brought by Club Exclusive against Mr. Duesenberg and Ms. Washburn were dismissed by the Court as non-cognizable on October 24, 2016, and both individual defendants are no longer parties to this action.[14] Consequently, Club Exclusive's negligence claim against Liberty that is premised upon the legally inactionable conduct of Mr. Duesenberg and Ms. Washburn is likewise without merit.

Thus, Liberty's Rule 56 Motion is due to be granted with respect to Club Exclusive's counterclaim for negligent hiring, training, monitoring, and supervision against Liberty.[15]

---

[14]  Club Exclusive has not sought reconsideration of the Court's decision to dismiss its claims filed against Mr. Duesenberg and Ms. Washburn and, the deadline to do so under the Court's Uniform Initial Order has long expired. (Doc. 2 at 26).

[15]  As analyzed above, Club Exclusive has failed to create a triable issue concerning Ms. Washburn's status as an employee or agent of Liberty. Additionally, Mr. Evans has affirmatively stated under oath that Ms. Washburn never was an agent for Liberty. Consequently, summary judgment in favor of Liberty on Club Exclusive's negligence counterclaim connected to the alleged wrongful acts of Ms. Washburn is appropriate for this additional reason. *Cf. Perkins v. Dean*, 570 So. 2d 1217, 1220, 1119 (Ala. 1990) (dismissing negligent supervision claim because of an absence of evidence showing knowledge of former employee's "alleged incompetency" that occurred some point after the employment relationship had ended–"[w]hen Dean had sex

### d. Alternatively, Club Exclusive Has Abandoned All Counterclaims.

In responding to Liberty's Rule 56 Motion, Club Exclusive offers no opposition to the dismissal of its counterclaims. Club Exclusive's silence constitutes an abandonment of those counts. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (citing *Dunmar*, 43 F.3d at 599)); *cf. McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with

---

with Roberta Perkins, he was not employed by or associated with Northwest in such a way that a master/servant relationship existed, nor did the intercourse take place within the line or scope of Dean's employment with Northwest." (citations omitted).

no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"). Thus, dismissing Club Exclusive's counterclaims is appropriate for this alternative reason.

## V. Conclusion

Liberty's Partial Strike Motion is due to be granted. Further, Liberty's Rule 56 Motion is due to be granted in part and otherwise denied.

With no pending claims remaining, this case is due to be dismissed with prejudice. The Court will enter a final judgment order consistent with this opinion.

**DONE** this 25th day of July, 2018.

**VIRGINIA EMERSON HOPKINS**
United States District Judge